IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

HEARTLAND CONSTRUCTION, INC., )
    Plaintiff, )
)
      v. )          Civil Action No. 2:21CV43 (RCY)
)
TRAVELERS CASUALTY AND )
SURETY COMPANY OF AMERICA, )
    Defendant. )
                          )

## MEMORANDUM OPINION

This matter is before the Court on Defendant Travelers Casualty and Surety Company of America's Motion for Summary Judgment (ECF No. 44) and Plaintiff's Motion for Summary Judgment (ECF No. 46). The Motions have been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons stated below, the Court will grant Defendant Travelers Casualty and Surety Company of America's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## I. BACKGROUND

**A. The Alleged Underlying Loss**

Heartland Construction, Inc. ("HCI" or "Plaintiff") is a Kentucky corporation with a principal place of business in Chesapeake, Virginia, and is a subcontractor in the business of managing and constructing large-scale construction projects. (Complaint ¶¶ 2, 6, ECF No. 1.) Travelers Casualty and Surety Company of America ("Travelers" or "Defendant") is a Connecticut insurance corporation. (*Id.* ¶ 3.) P.J. Potter Enterprises, Inc. ("PJP") is a veteran-owned general contractor in the business of building construction projects for the U.S. Veterans Administration

1

(*Id.* ¶ 7.)   Denny Hemmis is the owner and President of PJP. (*Id.* ¶ 8.)   Matt Hemmis, Denny

Hemmis' son, was employed as the President of HCI from August 3, 2015 to December 3, 2018.

(*Id.* ¶ 6; Pl.'s Mem. Supp. ¶ 30, ECF No. 47.)   Matt Hemmis ("Hemmis") also served as Vice

President of PJP while serving as HCI's President without HCI's knowledge or consent. (*Id.* ¶ 8.)

In March of 2017, the U.S. Veterans Administration ("VA") awarded PJP a contract for

the construction of a new building at the VA Medical Center in Hampton, Virginia (the "Project").

(*Id.* ¶ 9; Def.'s Mem. Supp. ¶ 2, ECF No. 45; Pl.'s Resp. ¶ 2, ECF No. 52; Pl.'s Mem. Supp. ¶ 1.)

HCI contends that it agreed to enter into a fixed-price Construction Management Agreement

("CMA") with PJP whereby HCI was to provide construction management services and second

and third tier subcontracts. (Def.'s Mem. Supp. ¶ 3; Pl.'s Mem. Supp ¶ 11.)   In November of 2017,

Hemmis created a new document or altered an existing Word document, thereby creating a less

favorable, cost-plus CMA between HCI and PJP related to the Project. (Def.'s Mem. Supp ¶ 6;

Pl.'s Resp. ¶ 6.)   HCI contends that Hemmis stole or destroyed a hard-copy, executed version of a

fixed-price CMA that was allegedly in HCI's paper files. (Def.'s Mem. Supp ¶ 7; Pl.'s Resp. ¶ 7.)

Hemmis was an authorized user of HCI's computer system during his employment until his laptop

and access to HCI's computer system were taken away on November 19, 2018. (Def.'s Mem.

Supp. ¶ 5; Pl.'s Resp. ¶ 5; Pl.'s Mem. Supp. ¶ 28.)   HCI was paid on a fixed-price, percentage-of-

completion basis, consistent with a fixed-price arrangement from June 30, 2017 through

September 30, 2018. (Def.'s Mem. Supp. ¶ 4; Pl.'s Resp. ¶ 4.)

In November of 2018, disputes arose between HCI and PJP when PJP attempted to take

over HCI's subcontracts and remove HCI from the Project. (Def.'s Mem. Supp. ¶ 8; Pl.'s Resp. ¶

8; Pl.'s Mem. Supp. ¶ 29.)   The disputes resulted in a mediation on January 21, 2019. (*Id.*)   Between

when the dispute arose and the mediation, on December 3, 2018, HCI terminated Hemmis'

employment. (Pl.'s Mem. Supp. ¶ 30.)   During the mediation, HCI, HCI's CEO Rhonda Bridgeman, PJP, Dennis Hemmis, and Hemmis executed a settlement agreement. (Def.'s Mem. Supp. ¶ 10; Pl.'s Resp. ¶ 11; Pl.'s Mem. Supp. ¶ 32.)   However, the cost-plus CMA created by Hemmis was not signed or delivered to HCI or its CEO until after the settlement agreement was signed on January 21, 2019. (Pl.'s Mem. Supp. ¶ 32.)   On February 14, 2019, HCI filed an arbitration demand against PJP alleging that PJP had failed to comply with the settlement agreement. (Def.'s Mem. Supp. ¶ 11; Pl.'s Resp. ¶ 11.)  On March 13, 2019, HCI issued a letter to the surety on a payment bond related to the Project, on which PJP was the principal, whereby HCI made a demand of payment of $750,648.98 on the basis of a fixed-price CMA between HCI and PJP and alleged that any cost-plus CMA relating to the Project had been "procured through fraud." (Def.'s Mem. Supp. ¶ 12; Pl.'s Resp. ¶ 12.)

HCI alleges that, in December 2018, HCI's IT manager, George Schnabel, received Hemmis' laptop and found that all of the laptop's software and files had been deleted. (Pl.'s Mem. Supp. ¶ 34.)   Despite the unusual deletions, Schnabel was able to retrieve the contents of the Hemmis laptop from a cloud-based backup. (*Id.* ¶ 35.)  After the deleted files were recovered and downloaded onto a hard drive, the hard drive was sent to BDO, HCI's forensic accountant. (*Id.* ¶ 36.)  BDO prepared a list of files that were retrieved from the cloud-based backup on Hemmis' laptop and among the files, HCI discovered a Word version of the fixed-price CMA created on January 31, 2017, that had been saved on HCI's servers. (*Id.* ¶¶ 37, 38.)   As a result of the discovery, on March 28, 2019, HCI's counsel issued a letter to the arbitrator stating that it would be amending its arbitration demand to allege fraud and fraud in the inducement by PJP and Hemmis. (Def.'s Mem. Supp. ¶ 15; Pl.'s Resp. ¶ 15.)  On April 2, 2019, HCI's counsel issued a letter to counsel for PJP and Hemmis alleging that the cost-plus CMA was "back dated" and

"fraudulent" and amended its arbitration demand to allege a fraudulent scheme by PJP and Hemmis to avoid paying HCI $898,677.27 by claiming that the parties had entered a cost-plus CMA rather than a fixed-price CMA. (Def.'s Mem. Supp. ¶ 16; Pl.'s Resp. ¶ 16.)

**B. The Crime Policy**

Travelers issued a Crime Policy, Policy No. 107060732, to HCI on March 14, 2019 (the "Crime Policy"). (Pl.'s Mem. Supp. ¶ 56.)  On October 1, 2019, HCI submitted a statement of its claim to Travelers. (*Id.* ¶ 58.)  On October 3, 2019, Travelers responded to HCI, acknowledging receipt of HCI's claim. (*Id.* ¶ 59.)  Later, on October 21, 2019, HCI provided a proof of loss to Travelers. (*Id.* ¶ 60.)

## II. PROCEDURAL HISTORY

HCI filed a Complaint (ECF No. 1) against Travelers for breach of contract and declaratory judgment on January 20, 2021.  HCI sought damages from Travelers "for Employee Theft under Insuring Agreement A.1., Forgery and Alteration under Insuring Agreement B., [], On Premises losses under Insuring Agreement C.1. and C.2., Computer Fraud under Insuring Agreement F.1.[,] and Claim Expenses under [I]nsuring Agreement I." (Compl. ¶ 1.)  On March 19, 2021, Travelers filed a Partial Motion to Dismiss (ECF No. 7).  The Court granted Travelers' Partial Motion to Dismiss, dismissing the parts of Plaintiff's Complaint seeking judgment based upon breach of contract and seeking declaratory relief under Insuring Agreements B., C.1, C.2, and F.1 (ECF No. 63).  That previous Memorandum Opinion is incorporated herein and will be referenced as appropriate.  On September 8, 2021, Defendant and Plaintiff filed Motions for Summary Judgment and Memoranda in Support (ECF Nos. 44-47).  On September 22, 2021, Defendant and Plaintiff filed their Responses in Opposition to each parties' Motion for Summary Judgment (ECF Nos. 51,

52).  On September 28, 2021, each party filed a Reply in support of its Motion for Summary Judgment (ECF Nos. 53, 54).

### III. STANDARD OF REVIEW

Summary judgment is appropriately granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." *DiSciullo v. Griggs & Co. Homes*, 2015 WL 6393813, at *4 (E.D.N.C. Oct. 22, 2015).  "The burden [then] shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "Summary judgment is particularly well-suited for resolution of insurance coverage disputes because the construction of insurance contracts is a legal question." *Grossberg v. Travelers Indem. Co. of Am.*, 825 F. Supp. 2d 717, 721 (E.D. Va. 2011) (citing *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 157 (E.D. Va. 1993)).

The Fourth Circuit notes that Virginia has adopted the Eight Corners Rule under which the court may "look primarily at the underlying complaints and the insurance policy to determine if there is a potential for coverage." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009); *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 465 (E.D. Va. 2002) ("the 'eight corners rule' requires review of '(1) the policy language to ascertain the terms of the coverage and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy.'") (internal citation omitted).  Furthermore, "[a] federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state." *Phila.*

*Indem. Ins. Co. v. Associated Univs., Inc.*, No. 3:20-CV-47, 2021 WL 4484556, at \*5 (W.D. Va. Sept. 29, 2021) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here, the forum state is Virginia, and "[i]n insurance coverage disputes, the general rule in Virginia is that 'the law of the place where an insurance contract is written and delivered controls issues as to its coverage.'" *Id*. (internal citation omitted). Here, the parties do not dispute the application of Virginia law. (Pl.'s Mem. Supp. at 14; Def.'s Mem. Supp. at 4 (citing Virginia law in support of their respective positions).)[1] As such, the Court shall apply Virginia law.

## IV. ANALYSIS

As noted above, the Court dismissed the parts of Plaintiff's Complaint seeking judgment based upon breach of contract and seeking declaratory relief under Insuring Agreements B., C.1, C.2, and F.1. (Op. at 8, ECF No. 63.) Accordingly, the only claim remaining is under Insuring Agreement A.1., covering Employee Theft, which provides as follows:

> The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to **Money, Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(ECF No. 47-32 at 1.) Defendant argues that Plaintiff is not covered under Insuring Agreement A.1 because there was no Theft under the Crime Policy, the fixed-price CMA is not a "Security" under the Crime Policy, there was no Theft of "Money" under the Crime Policy, and Plaintiff did not incur a loss directly caused by Hemmis' theft. (Def.'s Mem. Supp. at 16-23.) Plaintiff argues that it is entitled to summary judgment under Insuring Agreement A.1 because Hemmis' theft and destruction of the fixed-price CMA was an intentional, unlawful taking of the true subcontract that constitutes Theft of a Security as defined in Insuring Agreement A.1. (Pl.'s Mem. Supp. at 15.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

The parties disagree as to whether the fixed-price CMA that was allegedly stolen from HCI constitutes a "Security" under the Policy. Plaintiff argues that the fixed-price CMA is a Security under the plain language of the Policy because it was a subcontract that represented HCI's "Money." (Pl.'s Mem. Supp. at 15.) Plaintiff avers that the term "including" in the definition of Securities does not follow a limiting word such as "only" or "exclusively" and therefore it is not limiting. (*Id.*) Plaintiff argues that the definition of Securities applies to the fixed-price CMA as a "contract representing Money or property" because it entitled HCI to payment of $5,554,711. (*Id.*) Plaintiff also asserts that Travelers' claims counsel has admitted that the examples in the definition of Securities are not an exclusive list and that a promissory note would qualify as a contract representing money. (*Id.* at 15-16.) Thus, Plaintiff argues that even if Travelers disagrees that the plain language interpretation of the term "Security" includes the stolen fixed-price CMA, it must acknowledge that the term as applied to the fixed-price CMA is subject to more than one meaning and is, thus, ambiguous. (*Id.* at 16.)

Defendant argues that a construction contract does not "represent" either property or Money. (Def.'s Mem. Supp. at 18.) Defendant argues that the specific examples of instruments or contracts that represent "Money or property" are tangible property with intrinsic monetary value that can be redeemed for specific property. (*Id.*) Defendant avers that a construction contract has no such intrinsic monetary value and cannot be redeemed for "Money or other property" whether in electronic or hard-copy form. (*Id.* at 18-19.) Defendant argues that a construction contract merely reflects an arrangement whereby the contractor or subcontractor can perform services and earn the right to be paid for those services. (*Id.* at 19.) Further, the amount that would be owed under the contract was dependent on the amount of work performed by HCI, and the stated contract amount was subject to change due to change orders. (*Id.*) Additionally, Defendant argues that

7

"Securities" is unambiguous under Virginia law and that conflicting interpretations only reveal an ambiguity where they are reasonable. (Def. Resp. at 21, ECF No. 51 (citing *Caldwell v. Transportation Ins.*, 364 S.E.2d 1, 3 (Va. 1988)).)

In Virginia, courts interpret insurance policies "in accordance with the intention of the parties gleaned from the words they have used in the document." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354-55 (Va. 2019) (quoting *TravCo Ins. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012)).  This means that "a judicial interpretation should conform to the plain meaning that reasonable insurers and insureds likely would have attributed to the words." *Id.* at 355.  "The search for this plain meaning does not myopically focus on a word here or a phrase there." *Id.*  Rather, plain meaning "looks at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement." *Id.*  If the plain meaning is unascertainable, "Virginia courts apply the *contra proferentem* canon, which construes ambiguities against the drafter of the ambiguous language." *Id.*  Since the insurer is typically the disfavored drafter, courts counsel caution "because of the analytical ease with which a court may give up quickly on the search for a plain meaning by resorting to the truism that a great many words—viewed in isolation—have alternative, and sometimes quite different, dictionary meanings." *Id.*  Accordingly, under Virginia law, "conflicting interpretations reveal an ambiguity only where they are reasonable." *Id.* (citing *Caldwell*, 364 S.E.2d at 3 (recognizing that an ambiguity exists where "reasonable men . . . may reach *reasonable*, but opposite, conclusions" regarding the meaning of the disputed provision) (emphasis in the original)). "A 'reasonable' or 'fairly claimed' interpretation is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision." *Id.* at 356.  Indeed, a contract is not ambiguous simply because the parties to the contract disagree as to the meaning of its language so

first, the Court shall evaluate whether the definition of "Securities" under the Crime Policy is

ambiguous by assessing the reasonableness of the parties' interpretations. *Id.*

Here, the Crime Policy defines "Securities" as:

> [W]ritten negotiable and non-negotiable instruments or contracts representing
> **Money** or property including:
>   1. tokens, tickets, revenue and other stamps (whether represented by
>      actual stamps, or unused value in a meter) in current use; and
>   2. evidences of debt issued in connection with any **Credit**, **Debit or
>      Charge Card**, which cards are not issued by the **Insured**;
>      but does not include **Money**.

(ECF No. 47-32 at 13.)   Plaintiff alleges that the fixed-price CMA is a "contract representing

money or property" because it entitles Plaintiff to a payment. (Pl.'s Mem. Supp. at 15.)   The Court

disagrees. "Virginia courts have long recognized the doctrine of *noscitur a sociis*, which holds that

'when general and specific words are grouped, the general words are limited by the specific and

will be construed to embrace only objects similar in nature to those things identified by the specific

words.'" *Sentinel Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 804 F. Supp. 815, 818 (E.D. Va. 1992)

(quoting *Cape Henry Towers, Inc. v. National Gypsum Co.*, S.E.2d 476, 481 (Va. 1985)).   While

the Crime Policy's definition appears broad, as evidenced by use of term "including," the

definition provides examples of instruments or contracts that constitute "Securities" under the

Crime Policy. Consequently, the examples circumscribe the applicability of the definition to

instruments and contracts of the same nature as the examples.   Plaintiff contends that the fixed-

price CMA was a contract that represented HCI's "Money" or property.[2] (Pl.'s Mem. Supp. at 15.)

Under the doctrine of *noscitur a sociis*, the term "Securities" must be read to include only

those instruments or contracts representing Money that are similar to "tokens, tickets, revenue and

---

[2] The Crime Policy defines "Money" as "a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public." (ECF No. 47-32 at 12.)

other stamps (whether represented by actual stamps, or unused value in a meter) in current use."

(ECF No. 47-32 at 13.)  The Crime Policy does not provide definitions for tokens, tickets, revenue,

or stamps, so the Court will look to dictionary definitions of these terms to inform the Court of

reasonable uses of the terms when they are undefined in a contract. *Builders Mut. Ins. Co. v.*

*Parallel Design & Dev. LLC*, 785 F. Supp. 2d 535, 546 (E.D. Va. 2011) (citing *CACI Int'l, Inc.*,

566 F.3d at 158 (explaining that in determining the plain and ordinary meaning of an undefined

policy term, courts will first look to dictionary definitions, "[a]nd yet the ordinary and accepted

meaning of an undefined term cannot be divined in isolation, but instead is informed by the

surrounding context of the insurance policy.")).  Subsequently, with those uses as a guide, the

Court will examine the Crime Policy as a whole to "whittle those potential uses down to only those

that would be reasonable in the context of the entire policy." *Id.*

According to Merriam-Webster's dictionary, "token" is defined as "a piece resembling a

coin issued as money by some person or body other than a de jure government." Merriam–Webster

Online Dictionary (2022).  "Ticket" is defined as "a certificate or token showing that a fare or

admission fee has been paid." *Id.*  "Revenue" is defined as "the total income produced by a given

source." *Id.*  "Stamp," in the context similar to the preceding terms[3], is defined as "a stamped or

printed paper affixed in evidence that a tax has been paid." *Id.*  Each of these definitions support

Defendant's contention that "Securities" under the Crime Policy must have some intrinsic

---

[3] Virginia principles of contract interpretation are also governed by the doctrine of *ejusdem generis*. "This doctrine states that when a legal document lists specific items 'followed by a word of general import, the general word will not be construed to include things in its widest scope but only those things of the same import as that of the specific item[s] listed.'" *Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*, 2013 WL 12131747, at \*9 (E.D. Va. Aug. 23, 2013) (citing *Turner v. Reed*, 518 S.E.2d 832, 834 (Va. 1999) (holding that a will's reference to the testatrix's "furniture" and "automobile" as examples of her "personal property" limited the term "personal property" to tangible personal property, and thereby excluded intangible personal property)). Here, following tokens, tickets, and revenue, the Crime Policy includes "other stamps (whether represented by actual stamps, or unused value in a meter) in current use." In the context of this sentence, other definitions of stamps, such as "a device or instrument for stamping" or "the impression or mark made by stamping or imprinting," are clearly irrelevant. Therefore, the Court shall employ the definition aligned with or having the same import as the other examples listed.

monetary value or the ability to be redeemed for specific property. A common theme throughout the specific examples is that each of the "Securities" has some intrinsic value. This position is further solidified by another definition within the Crime Policy, "Other Property," defined as "any tangible property other than Money and Securities that has intrinsic value." (Exhibit O, ECF No. 47-32 at 12.) The Crime Policy makes it apparent that the covered instruments, contracts, and Other Property must have some kind of intrinsic value. Plaintiff's arguments are untenable. First, the language in the Crime Policy is unambiguous. It is apparent from the definition, non-exhaustive examples, and other items covered within the Policy that "Securities" is meant to include instruments and contracts that have intrinsic value or that, in and of themselves, can be exchanged for money. Further, Plaintiff's interpretation of the contract is not "equally possible given the text and context of the disputed provision." *Midlothian Enterprises, Inc. v. Owners Ins. Co.*, 439 F. Supp. 3d 737, 741 (E.D. Va. 2020) (internal citation omitted). According to Plaintiff's interpretation of "Securities," service contracts would be covered under the Crime Policy as long as the contract requires the payment of money in exchange for services or another condition precedent, a position unsupported by the plain meaning and context of the Crime Policy. *Id.* ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.") (quoting *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 796 S.E.2d 549, 555 (Va. 2017)); *Admiral Ins. Co. v. G4S Youth Servs.*, 634 F. Supp. 2d 605, 612 (E.D. Va. 2009) (A court "must not strain to find ambiguities."). Accordingly, the lack of ambiguity as to the definition of "Securities" renders the use of *contra preferentem* unnecessary, and the Court will enforce the Crime Policy as written. *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 713 (Va. 2012) ("Additionally, 'where the exclusion is not ambiguous, there is no reason for applying the rules of contra proferentem or liberal construction for the insured.'") (internal citation omitted);

11

*Admiral Ins. Co.,* 634 F. Supp. 2d at 611 ("If a court determines the contract is unambiguous, the court may then interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.").

Second, contrary to Plaintiff's claims, the fixed-price CMA does not represent money with intrinsic monetary value. Rather, the fixed-price CMA establishes a legal relationship between the parties that allows Plaintiff the opportunity to earn money through performance as specified within the contract. The fixed-price CMA does not have the same form or legal effect as a token, ticket, revenue, or other stamps. Plaintiff's claim to any money is conditioned on Plaintiff's performance under the contract rather than any intrinsic value in the contract itself. Plaintiff analogizes the construction contract to a plane ticket, but that analogy falls flat in this context. (Pl.'s Reply at 13-14.) The plane ticket in Plaintiff's analogy represents that money has already been paid to the airline, whereas the construction contract represents the right to money based on future completion of the contracted tasks. Though broad, the definition of "Securities" within the Crime Policy does not include the fixed-price CMA as a matter of law. Moreover, Plaintiff's coverage claim under Insuring Agreement A.1 relies solely on the argument that "Hemmis' theft and destruction of the fixed-price CMA was an intentional, unlawful taking of the true subcontract that constitutes theft of a *Security* as defined in Insuring Agreement A.1." (Pl.'s Mem. Supp. at 15 (emphasis added).) Accordingly, the Court's finding that the fixed-price CMA is not a Security under the Crime Policy is fatal to Plaintiff's claim and its Motion for Summary Judgment. Though the parties dispute whether a hard-copy contract was actually stolen, the answer to that question does not impact the Court's ruling.

## V. CONCLUSION

For the forgoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

An appropriate Order shall issue.

_____/s/ _____
Roderick C. Young
United States District Judge

Richmond, Virginia
Date:  August 30, 2022